(C. D. 2034)

JOHN A. STEER COMPANY *v.* UNITED STATES

United States Customs Court, Second Division

(Decided October 24, 1958)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff. *George Cochran Doub*, Assistant Attorney General (*Richard E. FitzGibbon* and *Henry J. O'Neill*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: In this case, plaintiff seeks a refund of excess customs duties alleged to have been erroneously assessed against an importation of cut squares of woven-wire cloth. The merchandise in question was classified by the collector as articles of base metal, not specially provided for, whether partly or wholly manufactured, and, therefore, subjected to duty at the rate of 22½ per centum ad valorem, pursuant to the provisions of paragraph 397 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802.

Plaintiff claims that the proper rate of duty for said merchandise is three-fourths of 1 cent per square foot, but not less than 10 per centum nor more than 20 per centum ad valorem, by virtue of the provision in paragraph 318 of said act, as so modified, for woven-wire cloth, with meshes not finer than 30 wires per lineal inch.

The precise wording of the competing provisions, as modified, *supra*, insofar as here applicable, reads as follows:

[PAR. 397]. Articles or wares not specially provided for, whether partly or wholly manufactured:

\*    \*    \*    \*    \*    \*    \*

Composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal (not including platinum, gold, or silver), but not plated with platinum, gold, or silver, or colored with gold lacquer:

\*    \*    \*    \*    \*    \*    \*

Other (except slide fasteners and parts thereof_ _ _ _ _ 22½% ad val.

[PAR. 318]. Woven-wire cloth: Gauze, fabric, or screen, made of wire composed of steel, brass, copper, bronze, or any other metal or alloy, not specially provided for:

With meshes not finer than thirty wires to
the lineal inch in warp or filling_ _ _ _ _ _ _ _ _ _ ¾¢ per sq. ft., but not less
than 10% nor more than
20% ad val.

It is not disputed that the subject merchandise has been woven from galvanized iron wire and is not finer than 30 wires to the lineal inch. More particularly, it is a standard 10 mesh, which has 10 wires per lineal inch, and, in its condition as imported, the merchandise was in 5½- and 6½-inch squares.

Apparently, it is the cut form and size of the product which has created the issue in this case. The position taken by the Government was stated at the trial to be as follows:

MR. FITZGIBBON: We concede, your Honor, that it was at one time woven-wire cloth and loosely might be referred to as woven-wire cloth. However, it

has been cut and is cut to particular sizes for particular uses, and has, therefore, become a manufacture of metal, and we will show that it is only used for one purpose.

CHIEF JUDGE OLIVER: In other words, you claim it is an article and not woven cloth?

MR. FITZGIBBON: That's right.

Counsel for plaintiff asserts that regardless of size, and whether or not cut, the merchandise is, and has always been, woven-wire cloth, and has never been known as anything else.

The only witness in the case was Paul H. Lenzner, sole owner of the Lenzner Wire Cloth Co., the actual importer of the instant merchandise, a sample of which, in the 6½-inch size, is in evidence as plaintiff's exhibit 1. He testified that he has been in the wire cloth business since 1901 and is familiar with all phases of its production and distribution. He has seen the product manufactured both in this country and abroad and has sold it extensively, since 1919, in the principal markets of the United States, to wit, the States of New York, New Jersey, Pennsylvania, and Connecticut, as well as in the States of Illinois, Ohio, Texas, and Florida, his company being one of the largest wire cloth manufacturers in the world.

According to this witness, the merchandise at bar was produced on a loom (pictorially represented by defendant's exhibit A), with knife attachments which shear the woven fabric into requisite sizes before it is taken off the loom. It is purchased and sold as woven-wire cloth, and has been so regarded in the trade and commerce of the United States throughout the entire period of his experience.

Lenzner further stated that wire cloth can be woven to any width or length, with or without a selvage. He was of opinion that neither the fact that it is cut on all sides, and hence is without a selvage, nor the size, affects its commercial status as woven-wire cloth.

The 5½- and 6½-inch squares are sold to several customers who manufacture metal parts. To the knowledge of the witness, the only articles manufactured from the imported merchandise are those represented by defendant's exhibits B–1 and B–2, which are squares with turned-back edges, and circular asbestos centers. However, it can be used for any other commodity the particular trades desire to make.

Predicated upon this record, counsel for plaintiff urges that the term "wire cloth," as commonly construed, has no limitations with respect to length, width, or selvage edging. If, however, the court should find to the contrary, it is argued that a commercial meaning, clearly including the imported merchandise, has been shown to exist. Our attention is called to the following definitions and quotations.

Webster's New International Dictionary:

**Wire cloth.** A fabric of woven metallic wire, as for strainers.

Summary of Tariff Information, 1929:

## WOVEN-WIRE CLOTH

**Description and uses.**—Woven-wire cloth, as the name indicates, is fabric or screen made of wire. It varies in the size of the mesh and of the wire used. The tariff act of 1922 divides woven-wire cloth into three groups or classes: (1) With mesh not finer than 30 wires to the lineal inch; (2) with mesh finer than 30 and not finer than 90 wires to the lineal inch, and (3) with mesh finer than 90 wires to the lineal inch.

Wire cloth in group (1) is commonly made of iron or steel wire, and is used in many ways, for example for safety guards for machinery, screen doors and windows, strainers of all sorts, ventilators, window and skylight covers, and conveyor belts.

From the case of *Cron & Dehn Hardware Corp. et al.* v. *United States*, 18 C. C. P. A. (Customs) 445, T. D. 44699:

* * * It would seem to be clear, therefore, that, although the paragraph is somewhat inartificially drawn, the Congress intended to limit its provisions to woven-wire cloth—a material "with fine meshes"—composed of wire, such as gauze, fabric, or screen; and that it was not intended to be sufficiently comprehensive to include woven-wire products with large meshes, such as poultry netting, fencing, and other similar wire products.

"Wire cloth" is defined as follows:

A texture of wire intermediate between wire gauze and wire netting, used for meat-safes, strainers, etc. [Century Dictionary and Cyclopedia.]

Wire. * * * w. cloth, a fabric of woven wire, as for strainers, window-screens, etc. * * * w. gauze, a material of gauzelike structure made of strands of interwoven wire. [Funk & Wagnalls New Standard Dictionary.]

Wire cloth. A fabric of woven metallic wire, used for strainers, in paper manufacture, etc.

Wire gauze. A gauzelike texture of fine wires. [Webster's New International Dictionary.]

The theory of the defendant derives from the proposition that the woven-wire squares at bar are manufactured, having been specifically cut to size and specially designed for exclusive use in the further manufacture of the articles represented by defendant's exhibits B–1 and B–2. Hence, they have lost their identity as material within the contemplation of paragraph 318, *supra*. It is also claimed that the proof is insufficient to establish commercial designation.

We do not agree that evidence of dedication to a specific end use can be spelled out from the instant record. Without further affirmative proof, it would be unreasonable to conclude that cut size alone constituted a dedication to a particular use and removed the articles from all other utility. Accordingly, it is our view that the conflict here must be resolved by a consideration of whether the provisions for "Woven-wire cloth: Gauze, fabric, or screen" is limited to running lengths of woven-wire goods, or includes cut pieces as well. In our determination of this question, we find the dictionary definitions to which our attention has been invited to be of little value. The emphasis therein is, as is to be expected, upon general aspects relating

to nature, composition, and use, rather than to any precise factor of size, shape, or form, such as is needed here.

A somewhat similar issue was, however, considered by this court in the case of *Lyons Transport* v. *United States*, 40 Cust. Ct. 33, C. D. 1954. It was there held that the provision of paragraph 1010 of the Tariff Act of 1930, as modified by applicable trade agreement, for woven fabrics, wholly or in chief value of vegetable fiber, contemplates fabric in the piece, and does not include narrow, serrated strips of cloth cut therefrom. Our conclusion was prompted in part by the case of *United States* v. *Milbank, Leaman & Co.*, 14 Ct. Cust. Appls. 166, T. D. 41693, wherein certain pieces of cloth imported for use as samples were held to be excluded from the provision of paragraph 1109 of the Tariff Act of 1922 for woven fabrics, wholly or in chief value of wool, the court being of the opinion that the term "fabrics" contemplates cloth or material in the piece, not further manufactured. We there stated:

> It needs no extensive elaboration to determine that the strips at bar are not woven fabrics in the piece. The evidence patently shows that they have been cut from piece goods, prior to importation, and as imported are no longer useful for all the purposes for which woven fabrics in the piece may be employed.

We apprehend no reason for applying a different construction here. Whether the word be "fabric" or "fabrics," "cloth," "gauze," or "screen," it seems clear that Congress has thereby made reference to a material in the piece, as distinct from pieces of material. Necessarily, the reduction in size of material, as by cutting, whether before or after removal from the loom, reduces its adaptability for use and makes of it something more than is provided for within the general terms employed in paragraph 318, *supra*. Accordingly, we hold that the instant woven-wire squares are not woven-wire cloth, as that term is commonly understood.

It is well settled, however, that tariff laws are written in the language of commerce which is only presumptively that in common use. Where it is shown that there existed in the trade of the United States, at or prior to congressional use of the language in question, another meaning thereof of general, definite, and uniform acceptance, applicable to imported merchandise, the latter will control for purposes of classification. *Nylos Trading Company* v. *United States*, 37 C. C. P. A. (Customs) 71, C. A. D. 422, and cases cited therein. This rule is subject to the proviso that proof of commercial designation must relate to the terms employed in the statute. *Stephen Rug Mills* v. *United States*, 32 C. C. P. A. (Customs) 110, C. A. D. 293.

The burden of proof of commercial designation is an onerous one. It requires that there shall be shown by a preponderance of evidence that the trade meaning was so well understood by those dealing with the product throughout the country that Congress must have been

presumed to have taken cognizance of it. As stated in the case of *Jas. Akeroyd & Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 440, T. D. 42641:

> Commercial designation is a thing often claimed in customs litigation and rarely established. The rule of commercial designation was never intended, as has been often said, to apply to cases where some portion of the trade use a certain trade practice or nomenclature, but was intended to apply to cases where the trade designation is so universal and well understood that the Congress, and all the trade, are supposed to have been fully acquainted with the practice at the time the law was enacted. There was never any other reason for the rule.

We are constrained to hold that commercial designation has not been established here. Notwithstanding the extensive selling experience of the witness for the plaintiff, it is our view that the requirement of generality, as meaning "extending over the entire country," has not been met. *Nylos Trading Company* v. *United States*, *supra*. When it is shown that sales have been made in eight states of the union, four of which are principal markets, it does not suffice to state that in the principal markets of the United States woven-wire cloth squares are designated as woven-wire cloth. *United States* v. *Pacific Overseas Co.*, *W. J. Byrnes & Co.*, 42 C. C. P. A. (Customs) 1, C. A. D. 559. The record is silent as to whether or not this merchandise was, at and prior to June 17, 1930, sold in other areas of the country, and, if so, how it was termed. Moreover, we question whether one witness, representing but one company, however large, can offer competent proof with respect to the commercial understanding of an entire trade. *Balfour, Guthrie & Co., Ltd.* v. *United States*, 32 C. C. P. A. (Customs) 144, C. A. D. 300.

By reason of the foregoing, we find and hold that the merchandise at bar is excluded from classification in paragraph 318, *supra*, as woven-wire cloth. All claims in the protest are, therefore, overruled.

Judgment will be entered accordingly.